**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 23-CR-114-JFH** |
| **JOHN RAY COLLINS, JR.,** | |
| **Defendant.** | |

<u>**OPINION AND ORDER**</u>

Before the Court is Defendant's Motion for Judgment of Acquittal and/or New Trial. Dkt. No. 218. The United States has responded to Defendant's Motion. Dkt. Nos. 224, 231. For the reasons set forth below, Defendant's Motion is DENIED.

**BACKGROUND**

Defendant John Ray Collins Jr. ("Mr. Collins") has been convicted, after jury trial, of Attempted Murder in Indian Country (Count 1), two counts of Child Abuse in Indian Country (Counts 3 and 5), and one count of Child Neglect in Indian Country (Count 7), all relating to his abuse and maltreatment of his two young stepsons.

Mr. Collins and his Co-Defendant Tambara Collins ("Mrs. Collins") resided in Okmulgee, Oklahoma with Mrs. Collins' two young sons, J.M. (six-years-old) and R.M. (four-years-old), and the Collins' infant daughter, E.C. On or around June 11, 2023, Mr. Collins came to believe that J.M. and R.M. had stolen money from him. Throughout the day of June 11, 2023, Mr. Collins took J.M. around the Collins' residence and surrounding property in an effort to locate the money; Mr. Collins repeatedly struck J.M. in the head and face during this ordeal in an attempt to extract information from him. J.M. described how Mr. Collins struck him in the head with a pipe, twisted

his arm behind his back until his finger broke, and stomped on his head and body because he was unable to locate the money.

When the children were taken from the Collins' home on June 12, 2023, R.M. was noted to have bruising around his eye, down his cheek, and on his arms and legs, and he walked with a noticeable limp. J.M. faired much worse. His head and body were covered in bruises, and he was bleeding from an open wound on his head which had obviously been unattended for some time.[1] He suffered from internal bleeding, liver laceration, possible skull fracture, a broken arm/elbow, and kidney failure. J.M. was immediately transported via Life Flight to St. Francis Hospital in Tulsa, Oklahoma; his condition on arrival was described as "near death" and he was placed in the Pediatric Intensive Care Unit. J.M.'s medical records revealed traumatic rhabdomyolysis (a breakdown of skeletal muscle due to direct or indirect muscle injury), liver laceration (consistent with the reported history of being stomped), acute kidney injury, two broken bones of the left arm, a broken ring finger on right hand, acute transaminitis (a medical condition where the levels of two liver enzymes are higher than normal in blood), left temporal head laceration, and acute blood loss anemia.[2]

A criminal complaint was filed against Mrs. Collins on June 15, 2023. Dkt. No. 1. Mr. Collins was charged by superseding indictment filed on August 9, 2023. Dkt. No. 43. In this final indictment, Mrs. Collins, an Indian, was charged with two counts of Child Abuse in Indian Country

---

[1]  The horrific scene was captured on video from the body camera of the deputy sheriff who responded to the welfare call. This trial exhibit depicted J.M.'s harrowing condition: a significant portion of the left side of his head was covered in caked-on, dried blood; his face, hands, and shirt were all spotted with blood. Both of J.M.'s eyes had been blackened and, indeed, most of his face was covered with significant bruises.

[2]  The evidence adduced at trial set forth more than a few instances of abuse; rather, the testimony of multiple witnesses revealed the ongoing verbal, physical, and emotional abuse and utter neglect of J.M. and R.M. that occurred over months.

under the Indian Major Crimes Act, 18 U.S.C. §1153 (the "MCA") and the Oklahoma child abuse statute, 21 O.S. §843.5(A), and Child Neglect in Indian Country under the MCA and that same Oklahoma statute. Dkt. No. 43. Mr. Collins, who is not an Indian, was charged with Attempted Murder in Indian Country, two counts of Child Abuse in Indian Country under the Assimilative Crimes Act, 18 U.S.C. §13 (the "ACA") and the Oklahoma child abuse statute, and Child Neglect in Indian Country under the ACA and the same Oklahoma statute. Dkt. No. 43.

Mrs. Collins pled guilty to all counts against her on October 24, 2023. Dkt. No. 156. Mr. Collins was tried before a jury from November 13, 2023 to November 17, 2023. The jury found Mr. Collins guilty of each count charged against him in the superseding indictment. Dkt. No. 196.

On July 21, 2024, over eight months after his conviction, Mr. Collins filed the present Motion, seeking either acquittal as to his child abuse convictions on Counts 3 and 5,[3] or a new trial. Dkt. No. 218. Mr. Collins relies upon a recently issued unpublished decision, *United States v. Jacob Thomas Shell*, No. 23-5086, 2024 WL 3455033 (10th Cir. July 18, 2024) (per curiam), in which the Tenth Circuit held that assimilating the assault provisions of Oklahoma's child abuse statute under the ACA would violate the Supreme Court's decision in *Lewis v. United States*, 523 U.S. 155 (1998).[4] According to Mr. Collins, *Shell* demonstrates that he was improperly charged under the ACA and the Oklahoma child abuse statute. Dkt. No. 218. The Government has responded, arguing that Mr. Collins' Motion is untimely and that *Shell* is both nonbinding and distinguishable. Dkt. Nos. 224, 231.

---

[3] Mr. Collins makes passing reference to suggest that his convictions for attempted murder (Count 1) and child neglect (Count 7) could be the subject of further motion; however, the Motion before the Court concerns only his child abuse convictions on Counts 3 and 5.

[4] Unpublished decisions are not precedential; they may be cited for their persuasive value only. *See* Fed. R. App. 32.1; 10th Cir. R. 32.1.

This Court agrees that Mr. Collins' Motion is untimely, and he has not offered sufficient justification for moving out of time.  Further, even if Mr. Collins' Motion were timely, this Court would still deny relief because the Oklahoma child abuse statute was properly applied to Mr. Collins' conduct in this case.

## AUTHORITY AND ANALYSIS

### I.    Federal Rules of Criminal Procedure 29 and 33.

Mr. Collins has moved for a judgment of acquittal under Fed. R. Crim. P. 29 or for a new trial under Fed. R. Crim. P. 33.  Under Rule 29, a court must, on defendant's motion, enter a judgment of acquittal of "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  A defendant's motion for judgment of acquittal must be made "within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c).  When the sufficiency of the supporting evidence is challenged, the court must examine the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Miller*, 987 F.2d 1462, 1464 (10th Cir.1993).

Rule 33 provides that, upon defendant's motion, the court "may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Such motion may be made within 3 years if premised upon newly discovered evidence or, if premised upon any other ground, must be made within 14 days after a guilty verdict.  Fed. R. Crim P. 33(b).

### II.    Defendant's Motion is untimely.

Mr. Collins' Motion asserts legal grounds that he claims justify relief and, in particular, relies upon the Tenth Circuit's *Shell* decision.  This is not "newly discovered evidence" and, as

such, the Motion should have been filed within 14 days of the jury verdict under both Rule 29(c) and Rule 33(b). This filing deadline passed some time ago; prior to the filing of his Motion, more than eight months passed since Mr. Collins was found guilty.

However, Mr. Collins' Motion may still be considered if its late filing is justified under Fed. R. Crim. P. 45(b), which allows for an extension of a deadline, after expiration of the deadline, "if the party failed to act because of excusable neglect." The Supreme Court has written that "excusable neglect" is "at bottom an equitable [determination], taking account of all relevant circumstances." *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 395 (1993). The Supreme Court specifically articulated the following factors for consideration in deciding whether a party has missed a deadline due to "excusable neglect": "the danger of prejudice to the [nonmoving party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Id.*; *see also United States v. Torres*, 372 F.3d 1159, 1162 (10th Cir. 2004). Further, "mistake of counsel or ignorance of the rules usually does not suffice" to satisfy the excusable neglect standard. *Putnam v. Morris*, 833 F.2d 903 (10th Cir. 1987). The same is true of ignorance of the law. *McIntyre v. Bd. of County Comm'rs*, 2008 U.S. Dist. LEXIS 9630, *2 (D. Colo. Jan. 29, 2008). Lastly, "fault in the delay remains a very important fact – perhaps the most important single factor – in determining whether neglect is excusable." *City of Chanute v. Williams Natural Gas Co.*, 31 F.3d 1041, 1046 (10th Cir. 1994).

Mr. Collins argues that the Tenth Circuit's issuance of the *Shell* decision gave rise to the instant Motion and, because he could not file a motion in reliance upon *Shell* prior to its issuance on July 28, 2024, the delay is no fault of his and constitutes excusable neglect. This Court does

not agree. While it is true that the *Shell* decision was only recently issued, *Shell* did not work any fundamental change in the applicable legal principles. Indeed, the *Shell* decision is unpublished and nonprecedential, and it relied on *Lewis v. United States*, 523 U.S. 155 (1998), and *United States v. Harris*, 10 F.4th 1005 (10th Cir. 2021); that is to say, *Shell* has changed nothing about the state of the law, and the arguments that Mr. Collins now raises could have been raised within the prescribed deadline. *See United States v. Smith*, 2024 WL 3757160, 2024 U.S. Dist. LEXIS 142718 (N.D. Okla. Aug. 12, 2024). Given that Mr. Collins could have raised the legal arguments in his Motion within the prescribed time period, the reason for delay is, at base, ignorance of the law, which is fairly attributable to Mr. Collins. Given that ignorance of the law can rarely be considered excusable neglect and that the "fault in the delay" is to be treated as perhaps the most important factor in the analysis, this weighs strongly against any finding that Mr. Collins' delay is attributable to excusable neglect.

The other *Pioneer* factors may favor finding excusable neglect, but these factors do not bear heavily in the Court's analysis. The Court does not doubt that the Motion has been made in good faith. Consideration of the Motion would not likely prejudice the Government, but this is not a consideration that weighs heavily: in any circumstance in which a defendant has missed a post-trial motions deadline, there is unlikely to be prejudice to the Government, but that does not mean that such deadlines should not be enforced. The same can be said regarding whether the delay is likely to delay proceedings; the Court agrees that the proceedings are not likely to be greatly impacted by Mr. Collins' delay in filing the instant Motion, but that will nearly always be the case where post-trial motions are concerned. These factors weigh, to some degree, in favor of finding excusable neglect, but the Court holds that they do not outweigh the simple fact that Mr. Collins could have filed the Motion within the deadline, and the delay is attributable to the Mr.

Collins and his ignorance of the law. Again, quite simply, despite *Shell*, the same underlying arguments were available to him previously. The Court holds that Mr. Collins' Motion for judgment of acquittal or new trial is untimely. *See Smith*, 2024 WL 3757160, 2024 U.S. Dist. LEXIS 142718 (finding post-trial motions untimely under the same circumstances).

### III.    Defendant was appropriately charged with Child Abuse under the ACA.

Even if Mr. Collins' Motion had been timely, this Court would still deny the relief requested. Given the nature and circumstances of Mr. Collins' conduct,[5] this Court is convinced that he was properly charged under the ACA with child abuse under the Oklahoma statute. The substantive issues raised in Mr. Collins' Motion would have profound impact on child abuse prosecutions in the federal courts throughout the State of Oklahoma, particularly given the unprecedented caseloads and jurisdictional complexities since the Supreme Court's decision *McGirt v. Oklahoma*, 140 S.Ct. 2452 (2020).[6] Given the import of these issues, this Court is compelled to address them further.

---

[5]    As will be demonstrated, the first question for assimilation under the ACA focuses on a defendant's conduct (*i.e.*, his "act or omission"), not the elements of the charged offense. *See Lewis,* 523 U.S. at 156.

[6]    In *McGirt v. Oklahoma*, 591 U.S. 894 (2020), the United States Supreme Court held that a portion of Northeastern Oklahoma including most of the City of Tulsa constitutes Creek Reservation land and, consequently, the State of Oklahoma has no jurisdiction to prosecute Indians for crimes committed therein. As a result, the volume of criminal cases filed in the federal courts of the Northern and Eastern Districts of Oklahoma have skyrocketed. Chief Justice Roberts recognized in his *McGirt* dissent, "the share of serious crimes committed by 10%–15% of the 1.8 million people in eastern Oklahoma . . . is no small number." 140 S.Ct. at 2501. This extraordinary number of criminal cases thrust into federal court, virtually overnight, is unlike anything ever seen in our Nation's history. Indeed, the Supreme Court has since recognized the "significant challenge for the Federal Government and for the people of Oklahoma" in the wake of *McGirt. Oklahoma v. Castro-Huerta*, 142 S.Ct. 2486, 2492 (2022). Numerous federal courts have "noted *McGirt*'s tremendous impact." *United States v. Budder*, 601 F. Supp. 3d 1105, 1114 (E.D. Okla. 2022) (collecting cases), *aff'd* 76 F.4th 1007 (10th Cir. 2023) ("To be sure, *McGirt* changed long-standing practice of the criminal-justice system in Oklahoma.").

A.      The Assimilative Crimes Act.

"With few exceptions, federal courts have abjured the power to fashion a federal common law of crime, holding that the Constitution generally assigns the job of specifying federal crimes and punishments to the Legislative Branch." *United States v. Christie*, 717 F.3d 1156, 1170 (10th Cir. 2013) (citing *Liparaota v. United States*, 471 U.S. 419, 424, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985); *United States v. Hudson & Goodwin*, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812)). In the early days of the republic when federal criminal statutes were few, this meant that federal enclaves[7] were "pretty literally lawless." *Id.*

Consequently, then Congressman James Buchanan in the early 1820s would point out to his fellow House Members a "'palpable defect in our system,' namely that 'a great variety of actions, to which a high degree of moral guilt is attached, and which are punished . . . at the common law, and by every State . . . may be committed with impunity' on federal enclaves." *Lewis v. United States*, 523 U.S. 155, 160 (1998) (quoting 40 Annals of Cong. 930 (1823)). Responding to this problem, Daniel Webster introduced the ACA. *See* 1 Cong. Deb. 338 (1825).[8] Instead of

---

Applying *McGirt*'s reasoning, the Oklahoma Court of Criminal Appeals has since held that nearly the entire eastern half of the State of Oklahoma is now considered Indian country. *See, Hogner v. State*, 500 P.3d 629 (Okla. Crim. App. 2021) (Oklahoma had no jurisdiction to prosecute Indian on Cherokee Nation Reservation) (overruled on other grounds by *Doe v. Parish*, 541 P.3d 833 (Okla. Crim. App. 2023)); *Grayson v. State*, 485 P.3d 250 (Okla. Crim. App. 2021) (same regarding Seminole Nation Reservation); *Sizemore v. State*, 485 P.3d 867 (Okla. Crim. App. 2021). This revelation of Indian country has resulted in a concomitant expansion of federal jurisdiction for the prosecution of major crimes under the MCA. And so too does this expanded view of Indian country now impact federal prosecutions under the ACA.

[7] "A federal enclave is created when a state cedes jurisdiction over land within its borders to the federal government and Congress accepts that cession. These enclaves include numerous military bases, federal facilities, and even some national forests and parks." *United States v. Jones*, 921 F.3d 932, n. 2 (quoting *Allison v. Boeing Laser Tech. Servs.* 689 F.3d 1234, 1235 (10th Cir. 2012)).

[8] "Under the Federal Enclave Act, Congress mandated that general laws of the United States applicable in federal enclaves also apply in Indian country, except where the offense was committed by one Indian against the person or property of another Indian." *Jones*, 921 F.3d 932,

trying to write an exhaustive federal criminal code for federal enclaves, Webster sought more expeditiously and cleverly to assimilate preexisting state law. *Id*. at 160-161; *Christie*, 717 F.3d at 1170. "A testament to its economy and design, the ACA remains today little changed from its original form." *Christie*, 717 3d at 1170.

The text of the ACA provides in relevant part:

> Whoever . . . is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State . . . in which [the federal enclave] is situated . . . shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. §13(a).

In *Lewis v. United States*, the Supreme Court addressed whether the ACA made applicable on a federal Army base located in Louisiana a state first-degree murder statute for the killing of a person under the age of twelve. *Lewis*, 523 U.S. at 158.[9] The Court observed that the federal murder statute, 18 U.S.C. § 1111, governed the crime at issue – the killing of a child "with malice aforethought" but without "premeditation." *Id.* However, under that statute, the crime would constitute second-degree, not first-degree, murder. *Id.*

The *Lewis* Court began its analysis:

> The ACA applies state law to a defendant's acts or omissions that are "not made punishable by *any enactment* of Congress." 18 U.S.C. § 13(a) (emphasis added). The basic question before us concerns the meaning of the italicized phrase. These words say that the ACA does *not* assimilate a state statute if the defendant's "act" or "omission" is punished by "any [federal] enactment." If the words are taken literally, Louisiana's law could not possibly apply to Lewis, for there are several

---

n. 2 (citing 18 U.S.C. § 1152). "Then, in the Indian Major Crimes Act, 18 U.S.C. § 1153, Congress extended jurisdiction over Indians in Indian country for the commission of specific "major crimes" against other Indians." *Id.* Both the ACA and the MCA were enacted to fill jurisdictional gaps. *Id.* at 935. The interplay between these statutes will be discussed further herein.

[9] The Louisiana statute defined first-degree murder to include "the killing of a human being . . . when the offender has the specific intent to kill or inflict great bodily harm upon a victim under the age of twelve . . . ." *Id.*

federal "enactments" that make Lewis' acts punishable, for example, the federal (second-degree) murder statute, § 1111, and the federal assault law, § 113. We agree with the Government, however, that this is not a sensible interpretation of this language, since a literal reading of the words "any enactment" would dramatically separate the statute from its intended purpose.

*Id*. at 159-160.[10]  The *Lewis* Court concluded that "Congress did not intend the relevant words – "*any* enactment" – to carry an absolutely literal meaning."  *Id*. at 162.[11]

However, the *Lewis* Court also rejected a too-narrow interpretation of the ACA's words (and, consequently, a much broader statutory reach), which would preclude assimilation only if "precisely the same essential elements" were made criminal by federal law and the relevant state

---

[10]  In his concurring opinion, Justice Scalia emphasized this point:

> Whether a federal assault statute (which is assuredly an "enactment") prevents assimilation of a state murder statute to punish assault that results in death depends principally upon whether fatal assault constitutes the same "act or omission" that the assault statute punishes.  Many hypotheticals posing the same issue can be conceived of.  For example, whether a state murder statute is barred from assimilation by a federal double-parking prohibition, when the behavior in question consists of the defendant's stopping and jumping out of his car in the traffic lane to assault and kill the victim.  The federal parking prohibition is sure enough an "enactment," but the issue is whether the "act or omission" to which it applies is a different one.  So also with a federal statute punishing insurance fraud, where the murderer kills in order to collect a life insurance policy on the victim.

*Id.* at 174.

[11]  Importantly, the Court directed focus on "[t]he ACA's basic purpose," that is "one of borrowing state law to fill gaps in the federal criminal law that applies on federal enclaves."  *Id*. at 160.

law. *Id*. at 162. The Court noted that this could lead to assimilation of state law where there is no

gap to fill.[12] Ultimately, the Court settled on a two-step test. *Id*. at 164.[13]

First, a court must ask: "Is the defendant's act or omission . . . made punishable by *any*

enactment of Congress." *Id*. at 164. If the answer is "no," then the ACA would presumably

assimilate the state statute. *Id*. If the answer is "yes," however, then the court must ask the further

question:

> whether the federal statutes that apply to the "act or omission" preclude application
> of the state law in question, say, because its application would interfere with the
> achievement of a federal policy, because the state law would effectively rewrite an
> offense definition that Congress carefully considered, or because federal statutes
> reveal an intent to occupy so much of a field as would exclude use of the particular
> state statute at issue.

*Id*. (internal citations omitted). This second, more nuanced question, is one designed to reveal

legislative intent. *Id*. at 166.

---

[12] The Court explained:

> Suppose, for example, that state criminal law (but not federal criminal law) makes
> possession of a state bank charter an element of an offense it calls "bank robbery";
> or suppose that state law makes purse snatching criminal under a statute that is
> indistinguishable from a comparable federal law but for a somewhat different
> definition of the word "purse." Where, one might ask, is the gap?

*Id*. at 163. Thus, the *Lewis* Court explained that such a broad view of assimilation would
"threaten[] not only to fill nonexistent gaps, but also [] rewrite each federal enclave-related
criminal law in 50 different ways, depending upon special, perhaps idiosyncratic, drafting
circumstances in different States." *Id*. Now, one might wonder whether this concern is applicable
in this case of evaluating the assimilation of Oklahoma's felony child abuse statute when it is
recognized that there is no federal felony child abuse statute. That would seem a valid point, but
a deeper dive into the assimilation test pronounced in *Lewis* - and the interplay of the general
federal assault statute (18 U.S.C. § 113) - should be examined first.

[13] The two-step test has been referred to as a "Goldilocks solution, landing somewhere in the
middle." *Harris*, 10 F.4th at 1012.

The *Lewis* Court made several observations regarding how such a legislative intent might manifest.  "[I]t seems fairly obvious that the [ACA] will not apply where both state and federal statutes seek to punish approximately the same wrongful behavior . . . ."  *Id.*  at 165.  Similarly, the ACA's basic purpose makes it clear that "assimilation may not rewrite distinctions among the forms of criminal behavior that Congress intended to create."  *Id.*  "[O]rdinarily, there will be no gap for the [ACA] to fill where a set of federal enactments taken together make criminal a single form of wrongful behavior while distinguishing (say, in terms of seriousness) among what amount to different ways of committing the same basic crime."  *Id.*  "At the same time, a substantial difference in the kind of wrongful behavior covered (on one hand by the state statute, on the other, by federal enactments) will ordinarily indicate a gap for a state statute to fill – unless Congress . . . indicates to the contrary in a particular case."  *Id*. at 165-66.  The Supreme Court emphasized: "The primary question (we repeat) is one of legislative intent:  Does applicable federal law indicate an intent to punish conduct such as the defendant's to the exclusion of the particular state statute at issue?"  *Id*. at 166.

The ultimate question in *Lewis* concerned whether Louisiana's first-degree murder statute, which included a provision specific to child murder, was appropriately assimilated against the defendant, who was charged with killing her four-year-old daughter on a U.S. Army base.  *Id*. at 159.  Applying the above principles, the Court began by examining the federal murder statute, 18 U.S.C. §1111, and the Louisiana statute at issue.  *Id*. at 166-167.  The Court observed that the two statutes covered "different forms of behavior," which weighed in favor of assimilation.  *Id*. at 169. However, the detailed nature of the federal statute indicated an intent to cover the entire field of

murder. The Court observed that the federal murder statute "covers all variants of murder."[14] The Court also noted that, when writing and amending the ACA, Congress expressly referred to murder as an example of a crime covered by, as opposed to an example of a gap in, federal law. *Id.* at 170.[15] Thus, the Court concluded that federal law does not assimilate Louisiana's first-degree murder statute. *Id.* at 172.

Interestingly for present purposes, the Supreme Court expressed no view on assimilating state child abuse statutes notwithstanding the presence of a federal assault statute (18 U.S.C. § 113). *Id.* at 171-172. The Court did note, however, that "the federal assault prohibition is less comprehensive than the federal murder statute, and the relevant statutory relationships are less direct than those at issue here." *Id.*

**B.    The federal assault statute does not comprehensively punish child abuse.**

*Lewis* instructs to first question whether any act of Congress punishes Mr. Collins' conduct with regard to the child abuse he committed here (Counts 3 and 5). *Id.* at 164. Mr. Collins' conduct of violently battering and torturing R.M. and J.M. – by striking the boys with his hands, kicking and stomping J.M., and striking J.M. with a blunt object – could have been charged as violations of the federal assault statute, 18 U.S.C. §113. But that does not end the inquiry. The second

---

[14] The federal statute includes a specifically defined list of "first degree" murders and all "other" murders, labeled as "second degree." The Court concluded that the way in which "first degree" and "second degree" murder are linguistically interwoven, the fact that "first degree" list is detailed, and the extreme breadth of possible sentences (ranging from any term of years to death) reflected "considered legislative judgment" and left no gap to fill by the Louisiana's murder statute. *Id.*

[15] The Court also reasoned that allowing assimilation under these circumstances would unfairly subject individuals residing in federal enclaves to both state and federal laws, treating them differently from others in the state. *Id.* at 171. The corollary would seem to be true to the extent that the relevant federal and state statutes would treat individuals drastically different for the same conduct. *See infra.*, § III(D).

question is whether the federal assault statute precludes application of Oklahoma's child abuse statute, Okla. Stat. tit. 21, § 843.5. *Lewis*, 523 U.S. at 164. Again, as the Supreme Court has emphasized, this turns on the primary question of legislative intent – *i.e.*, whether the federal assault statute indicates an intent to punish conduct such as Mr. Collins' to the exclusion of the Oklahoma child abuse statute. *Id*. at 166.

The federal assault statute reads as follows:

(a) Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows:

(1) Assault with intent to commit murder or a violation of section 2241 or 2242, by a fine under this title, imprisonment for not more than 20 years, or both.

(2) Assault with intent to commit any felony, except murder or a violation of section 2241 or 2242, by a fine under this title or imprisonment for not more than ten years, or both.

(3) Assault with a dangerous weapon, with intent to do bodily harm, by a fine under this title or imprisonment for not more than ten years, or both.

(4) Assault by striking, beating, or wounding, by a fine under this title or imprisonment for not more than 1 year, or both.

(5) Simple assault, by a fine under this title or imprisonment for not more than six months, or both, or if the victim of the assault is an individual who has not attained the age of 16 years, by fine under this title or imprisonment for not more than 1 year, or both.

(6) Assault resulting in serious bodily injury, by a fine under this title or imprisonment for not more than ten years, or both.

(7) Assault resulting in substantial bodily injury to a spouse or intimate partner, a dating partner, or an individual who has not attained the age of 16 years, by a fine under this title or imprisonment for not more than 5 years, or both.

(8) Assault of a spouse, intimate partner, or dating partner by strangling, suffocating, or attempting to strangle or suffocate, by a fine under this title, imprisonment for not more than 10 years, or both.

(b) Definitions. In this section—

  (1) the term "substantial bodily injury" means bodily injury which involves—

    (A) a temporary but substantial disfigurement; or

    (B) a temporary but substantial loss or impairment of the function of any bodily member, organ, or mental faculty;

  (2) the term "serious bodily injury" has the meaning given that term in section 1365 of this title;[16] …

18 U.S.C. §113.

The Oklahoma child abuse statute provides that "child abuse" shall be punished by up to life imprisonment, a fine of up to $5,000, or both, and it defines "child abuse" as:

  a. the willful or malicious harm or threatened harm or failure to protect from harm or threatened harm to the health, safety or welfare of a child under eighteen (18) years of age by a person responsible for a child's health, safety or welfare, or

  b. the act of willfully or maliciously injuring, torturing or maiming a child under eighteen (18) years of age by any person;

21 Okla. Stat. § 843.5(A), 843.5(O).

The federal assault statute is wide ranging in its overall scope but punishes assaults against children in only narrow circumstances. In contrast, the Oklahoma statute "focuses upon a narrower (and different) range of conduct" – the Oklahoma statute focuses solely upon child abuse while the federal statute addresses assaults of any kind. *Lewis*, 523 U.S. at 169. This consideration "argues in favor of assimilation." *Id.*

---

[16] 18 U.S.C. §1365(h)(3) defines "serious bodily injury" as bodily injury involving:

  (A) a substantial risk of death;
  (B) extreme physical pain;
  (C) protracted and obvious disfigurement; or
  (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty

However, if the federal assault statute evidences a legislative intent to preclude application of the state child abuse statute, then such intent is determinative. The federal statute distinguishes between various categories of assault and provides maximum punishments based upon these distinctions. The statute punishes more harshly assaults committed with the specific intent to commit murder or another felony. *See* 18 U.S.C. §113(a)(1)-(2). The statute draws further distinctions based upon method of assault, *i.e.*, with a dangerous weapon as opposed to "by striking, beating, or wounding" (18 U.S.C. §113 (a)(3)-(4)); based upon the degree of injury inflicted, *i.e.*, simple assault vs. assault resulting in serious bodily injury vs. assault resulting in substantial bodily injury (18 U.S.C. §113 (a)(5)-(7)); and based upon the victim of the assault (18 U.S.C. §113 (a)(5), (7)-(8)).

The *Lewis* Court wrote that "ordinarily, there will be no gap for the Act to fill where a set of federal enactments taken together make criminal a single form of wrongful behavior while distinguishing (say, in terms of seriousness) among what amount to different ways of committing the same basic crime." 523 U.S. at 165. Section 113 would seem to fit this bill. For example, in *Harris*, the defendant pointed a gun at another camper in Yellowstone National Park during a heated argument. *Harris*, 10 F.4th at 1009. While defendant could have been charged under the federal assault statute, he was charged and convicted under a Wyoming assault statute by use of the ACA.[17] There, the Tenth Circuit concluded that assimilation of the state statute was improper because it would "effectively rewrite an offense definition" of assault "that Congress carefully considered." *Id*. at 1013. The *Harris* Court further found that the structure of § 113 indicated an

---

[17] The Wyoming statute provided that: "A person is guilty of aggravated assault and battery if he . . . [t]hreatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another." *Id*. at 1012 (quoting Wyo. Stat. Ann. § 6-2-502(a)(iii)).

intent to punish Mr. Harris's conduct to the exclusion of the particular state statute at issue. *Id*. at 1014. And the Court found that the Wyoming assault statute and the federal assault statute "seek to punish approximately the same wrongful conduct" which it referred to as "the same basic crime of assault." *Id*. at 1014-1015.[18]

Yet, the *Lewis* Court also wrote that the federal assault statute "is less comprehensive than the federal murder statute, and the relevant statutory relationships are less direct than those at issue here." *Id*. at 171-172. The differences between the federal murder statute and § 113 are clear, and there are patent "gaps" in the federal assault statute.

The *Lewis* Court also noted that the federal murder statute, 18 U.S.C. § 1111, comprehensively covers all variants of murder; the provisions are "linguistically interwoven" such that there are no gaps in coverage. *Lewis*, 523 U.S. at 169. This is simply not true of the federal assault statute's coverage of child abuse. For instance, though the statute specifically addresses assaults against individuals who "have not attained the age of 16," it only draws this distinction with respect to simple assaults (§113(a)(5)) and assaults resulting in substantial bodily injury (§113(a)(7)); the statute entirely fails to specifically punish, for instance, assaults against children that inflict serious bodily injury (more egregious than "substantial bodily injury"), assaults against children with a dangerous weapon, and assaults against children with the intent to commit murder.

---

[18] Recently, in *Shell*, the Tenth Circuit held that "[a]ssimilating the assault provisions of Oklahoma's statute [§ 843.5(A)] would be just as disruptive to 'Congress's careful assault definition' in § 113 as assimilating Wyoming's statute in *Harris* would have been." *Shell*, 2024 WL 3455033 at *4. Certainly, this gives this Court pause. However, it must be noted that § 843.5 does not attempt to define assault, but rather "child abuse" and "child neglect." Similarly, § 113 does not attempt to define "child abuse." Rather, it has been recognized that "federal law does not define or directly punish 'felony child abuse or neglect.'" *United States v. Clark*, 981 F.3d 1154, 1163 (10th Cir. 2020). And as will be explained further herein, Congress has expressly made clear it sees a distinction between felony assault under § 113 and felony child abuse or neglect. *See infra.*, § III(C).

The *Lewis* Court also noted that the federal murder statute included a broad range of punishment – from any term of years to life in prison – which also further indicated an intent to cover the field of murder.  In contrast, in punishing crimes against children, § 113 provides only imprisonment for up to 1 year for simple assault, or imprisonment for up to 5 years for assault resulting in substantial bodily injury.  Viewed as a child abuse statute, § 113 is replete with gaps in coverage, and the statute gives no indication of congressional intent to punish child abuse to the exclusion of the Oklahoma state statute.

**C.    Congress has clearly distinguished § 113 assault from child abuse.**

Section 113's failure to comprehensively address child abuse is to be expected:  the assault statute is not a child abuse statute, and it was not drafted to function as a child abuse statute.  The Tenth Circuit has itself observed that "federal law does not define or directly punish 'felony child abuse or neglect.'"  *United States v. Clark*, 981 F.3d 1154, 1163 (10th Cir. 2020).

In endeavoring to discern whether Congress intended for the federal assault statute to preempt application Oklahoma's child abuse statute, reference to the MCA, 18 U.S.C. §1153, is instructive.  This is appropriate because the MCA, like the ACA, concerns the interplay of state and federal criminal laws and when state laws may be applied in federal prosecutions; indeed, the MCA was invoked in this matter in the prosecution of Mr. Collins' co-defendant, Mrs. Collins. "Because of the similarities between the ACA and MCA, it is unsurprising that courts look to cases interpreting one to shed light on the interpretation of the other."  *United States v. Jones*, 921 F.3d 932, 936 (10th Cir. 2019).  Both the ACA and MCA were enacted to fill jurisdictional gaps.  *Id.* at 935.

6:23-cr-00114-JFH    Document 234    Filed in ED/OK on 12/04/24    Page 19 of 23

The text of the MCA provides:

(a) Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, a ***felony assault under section 113, an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect***, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

(b) Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

18 U.S.C. §1153 (emphasis added).[19]

The MCA closely juxtaposes "felony assault under section 113," "assault against an individual who has not attained the age of 16 years," and "felony child abuse or neglect." This is a clear indication that Congress does not view § 113 as a child abuse statute. In fact, Congress amended the MCA in 2006 to add "felony child abuse or neglect" as an enumerated offense; it was inserted at its current position, directly adjacent to "assault against an individual who has not attained the age of 16 years." *See* Adam Walsh Child Protection and Safety Act of 2006, 109 P.L. 248, 120 Stat. 587, 617.[20]

---

[19] Similarly, it should be noted that "[p]rosecution under the ACA is not for enforcement of state law, but for enforcement of federal law assimilating a state statute." *United States v. Brown*, 608 F.2d 551, 553 (5th Cir. 1979). "An *assimilated* charge is a *federal* charge." *Christie*, 717 F.3d at 1172-1173. Offenses properly assimilated into federal law are no less part of federal law than any other of Congress's statutorily defined crimes. *Id*. at 1173.

[20] The addition of the crime "felony child abuse or neglect" to the MCA was originally proposed in the Indian Child Protection and Family Violence Prevention Amendments of 2006 "to close the gap that exists in addressing the full range of crimes that may be inflicted on children." *United States v. Other Medicine*, 596 F.3d 677, 680 (9th Cir. 2010) (quoting S. Rep. 109-255, at 5 (2006)).

In 2013, Congress further amended the MCA by adding "felony assault under section 113" directly before "assault of an individual who has not attained the age of 16 years." *See* Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, § 906(b), 127 Stat. 54, 125 (2013). Congress notably retained "felony child abuse or neglect" within the MCA. Congress clearly views "child abuse or neglect" as distinct from § 113 assault or "assault against an individual who has not attained the age of 16 years." If Congress had viewed the assault provisions of § 113 as covering the field of child abuse, it would have removed "felony child abuse or neglect" in its 2013 amendments to the MCA. Certainly, this is true because there is no federal law defining or punishing felony child abuse. *See Other Medicine*, 596 F.3d at 681 ("Without a federal law defining and punishing felony child abuse, the government may look to applicable state law to define that crime."). In *United States v. Scott*, the Ninth Circuit rejected the argument that § 113(a)(7) (assault resulting in substantial bodily injury to an individual who has not attained the age of 16 years) displaced the crime of felony child abuse. 83 F.4th 796, 800 (9th Cir. 2023). As the Court explained:

> [T]he 2013 amendments *retained* "felony child abuse" as a separate offense. If Congress intended § 113(a)(7) to replace felony child abuse, it would have deleted felony child abuse from the [MCA]. Congress did not do so. Thus, "felony assault under § 113" and "felony child abuse" remain discrete crimes chargeable under the [MCA].

*Id.* at 800.

When a statute contains a plainly expressed intent of Congress, that intent – rather than a proxy – controls. "After all, why employ a *proxy* for congressional intent when we have *direct evidence* of Congress's wishes?" *Christie*, 717 F.3d at 1173. The words Congress used in the MCA must be respected; Congress expressly referred to "felony assault under section 113," "an assault against an individual who has not attainted the age of 16 years," and "felony child abuse or neglect" as separate and distinct crimes. Indeed, the distinction between the federal assault

statute and child abuse is sufficiently clear that it has become uncontroversial in MCA prosecutions to incorporate state child abuse statutes against Indian defendants.  *See Clark*, 981 F.3d 1154; *Other Medicine*, 596 F.3d 677.

> **D.    Congress did not intend for the federal assault statute to preempt application of state child abuse statutes.**

In this Court's view, the above sufficiently demonstrates that § 113 was not intended by Congress to comprehensively punish child abuse; put another way, there are "gaps" in the statute's coverage of child abuse.  To return to the crucial question:

> whether the federal statutes that apply to the act or omission preclude application of the state law in question, say because its application would interfere with the achievement of a federal policy, because the state law would effectively rewrite an offense definition that Congress carefully considered, or because federal statutes reveal an intent to occupy so much of a field as would exclude use of the particular state statute at issue.

*Lewis*, 523 at 164-165.

Does § 113 "reveal an intent to occupy" so much of the field of child abuse "as would exclude use" of the Oklahoma child abuse statute?  In this Court's view, the answer is plainly no. The MCA is a clear indication from Congress that it did not intend for § 113 to be the sole mechanism for the prosecution of child abuse.

Was the federal assault statute enacted to achieve "federal policy" regarding the prosecution of child abuse, to the exclusion of state child abuse statutes?  This Court thinks not. If § 113 were intended by Congress as the sole embodiment of federal policy regarding the punishment of child abuse to the exclusion of state child abuse statutes, Congress would not have then subsequently acknowledged within the MCA that § 113 is *not* a child abuse statute and given federal courts free rein to prosecute Indians under state child abuse statutes.  It seems particularly unlikely that Congress intended to permit courts to prosecute Indian defendants under (more punitive) state child abuse statutes, while prohibiting such prosecutions against non-Indians; such

an interpretation is offensive to basic notions of justice, and it would be contrary to the MCA's stated aim of subjecting Indians "to the same law and penalties as all other persons . . . ." 18 U.S.C. §1153(b).[21]

Would application of Oklahoma's child abuse statute "effectively rewrite an offense definition that Congress carefully considered"? Again, no. If § 113 embodied a "carefully considered" attempt to punish all acts of child abuse, then Congress would have removed "felony child abuse" from the MCA as a specifically enumerated offense when it added "assault under section 113" thereto.

## CONCLUSION

The provisions of the MCA only underscore what the language of § 113 already reveals: numerous gaps in crimes against children that do not reveal the kind of comprehensive coverage which would indicate a "carefully considered" attempt by Congress to punish all acts of child abuse to the exclusion of state child abuse statutes. Accordingly, this Court holds that the federal assault statute does not preclude assimilation of the Oklahoma child abuse statute under the ACA.

---

[21] The disparity that would be created by precluding assimilation of the Oklahoma child abuse statute is particularly highlighted here. Mrs. Collins, an Indian, has pled guilty to two counts of child abuse and one count of child neglect under the Oklahoma child abuse statute and the MCA, and faces statutory maximum sentences up to life as to each count. The notion that Mr. Collins, solely because he is not an Indian, would be subject to far lesser maximum sentences for similar conduct appears, in this Court's view, antithetical to Congress's intent. If Mr. Collins were to avoid assimilation of the Oklahoma child abuse statute here, it would only be because his abuse of two young Indian children was committed in Indian country (which has now been recognized to encompass nearly the entire eastern half of the State of Oklahoma). This Court acknowledges that it is not a policy maker – and it does not seek to become one; that is the province of Congress. The point here is that this Court has seen no evidence that Congress intended such egregious, disparate treatment between Indians and non-Indians.

IT IS THEREFORE ORDERED that Defendant's Motion for Judgment of Acquittal and/or New Trial [Dkt. No. 218] is DENIED.

Dated this 4th day of December 2024.

_____
JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE